# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TAKODA HLAVATY, et al., | § § § § § § § § § § § | |
| Plaintiffs, | | |
| vs. | | Civil Action No. 5:16-cv-000949-RP |
| INTEGRATED PRODUCTION SERVICES, INC. | | |
| Defendant. | | |

### AFFIDAVIT OF SCOTT MCFARLAIN

| | |
|---|---|
| STATE OF TEXAS | § § § |
| COUNTY OF VICTORIA | |

Before me, the undersigned authority, on this day personally appeared Scott McFarlain known to me to be the person whose name is subscribed below and who under oath did state the following:

1. "My name is Scott McFarlain. I am employed by Integrated Production Services, Inc. ("IPS") as a District Manager in Victoria, Texas in the U.S. South Region. I have been a District Manager for IPS in Victoria, Texas since May 2014. Prior to that, I was a District Manager for IPS in Dickinson, North Dakota beginning in 2012. I have worked for IPS since 2007. I am duly authorized to make this Affidavit and the matters set forth below are true and correct and are within my own personal knowledge.

2. IPS provides coil tubing services to customers in the oil and gas industry. The coil tubing process provides a client the ability to perform a variety of services inside the well bore using a continuous stream of steel pipe. The coil tubing process deploys tools into the well bore in order to service the well, including setting plugs, cleaning out the well and drilling out plugs.

3. IPS provides a variety of equipment and employees to operate the coil tubing equipment at the well site. This includes a coil tubing unit which is transported by two semi-trucks. One semi-truck contains the steel pipe and the other truck transports the control center. A crane will also be utilized. A fluid pump will also be utilized. Additionally, a nitrogen pump will be utilized to hold liquid nitrogen. There will also be a tool trailer containing tools. Additionally, a blowout preventer will also be used.

4. The coil tubing equipment would be operated by a crew of three to seven Operators, including Coil Tubing Operators, Senior Coil Tubing Operators, Crane Operators, Nitrogen Operators, Pump Operators, Senior Pump Operators, Coil Tubing Helpers (collectively, "Operators"). The crew would be supervised by a Coil Tubing Supervisor ("CT Supervisor").

5. I have served as District Manager with IPS in Victoria, Texas and, before that, in Dickinson, North Dakota, for two years, since the beginning of 2012. During that time, I have personal knowledge that all that all Operators who performed manual labor, such as the maintenance and operation of oilfield equipment, have been paid on an hourly basis and have received overtime for hours worked over 40 in a workweek. These hourly Operators also received daily job bonuses, which bonuses were included in the calculation of their overtime pay. After the downturn in the industry only Coil Tubing Operators received bonuses.

6. I have never personally instructed an Operator to perform any work for which he was not properly paid. I am also not aware that any of the supervisors in my chain of command – including, but not limited to salary-paid Coil Tubing Supervisors, Field Supervisors, or Operations Managers – have ever instructed an Operator to perform work without pay. More specifically, I have never instructed any Operators to perform "off-the-clock" work for which they were not paid, including, but not limited to taking work-related phone calls without pay (exceptions noted below), servicing or driving trucks without pay, loading trucks without pay, or refueling vehicles without pay. I am also unaware that any supervisor in my chain of command has ever instructed any Operator to do so. Furthermore, no Operator has ever complained to me that they were required to perform work "off the clock" without pay or that their overtime pay was calculated incorrectly.

7. I am aware that Operators have been called or sent text messages by supervisors following a work shift on limited occasions. More specifically, I recall that hourly Operators may have been called by supervisors following a work shift when: (1) a call came in from a client for a job that was scheduled to begin the following day and therefore a supervisor needed to contact the Operator following a work shift to inform the Operator regarding the specifics of the job, including the specific job tasks and location of the job; and/or (2) when there was an issue with an Operator's timesheet and the supervisor needed to contact the Operator after work in order to resolve the discrepancy and submit the employee's timesheet to Company Payroll in a timely manner. From personal experience, I am aware that these situations would not have occurred very often, and when they did, the telephone calls or text messages exchanged between supervisor and Operator would have not have lasted any longer than three to five minutes on average.

8. I am also personally aware that the Company policy regarding driving company trucks and driving time is that when an Operator is working at the yard or on a location close to the yard, the Operator would clock in when they arrive at the yard in the morning and the Operator would not clock out until they leave the

yard, after they are finished with all work activities on their shift. Commute time, meaning time traveling to and from the yard, is not compensable. However, if an Operator is working on a remote jobsite and staying in a hotel or similar living accommodation, the Operator would be paid from the time they left the hotel to travel to the remote jobsite and the Operator would be instructed not to clock out until they arrived back at the hotel following the work shift.

9. From the time I became a District Manager until approximately the beginning of 2014, I am aware that the timekeeping policy in Texas was for hourly Operators to fill out and submit manual, hand-written timesheets showing their hours worked on a weekly basis to their Operations Manager. Pursuant to Company policy, the Operators would sign the timesheets, which indicated their approval and their representation that the hours reported were true and correct to the best of their knowledge and inclusive of all time worked. The Operations Manager would then review the timesheets and submit them to the District Manager for approval. If there was a discrepancy or other timekeeping issue, the supervisor or District Manager would discuss the issue with the Operator. Once the District Manager approved the timesheet, it would be submitted to Office Administrator, who would then transcribe the handwritten timesheets into a spreadsheet and submit the time to Payroll for payment.

10. At approximately the beginning of 2014, hourly Operators began submitting their time through a mobile application on their smart phones entitled "J.J. Keller." Through the J.J. Keller application, Operators would also clock in and clock out for work. The application would further record the Operators' time worked to the nearest minute. Every other Monday afternoon, the Operators' time would then be transferred from the J.J. Keller application to the Kronos electronic timekeeping system. The Operators would then log in and review their time entries in Kronos and approve their time. The time would subsequently be approved by the District Manager and submitted to Company Payroll in Kronos for payment.

11. I am personally familiar with Plaintiffs Michael Hooker, Michael Muniz, and Jeremy Radcliffe. These individuals were employed by IPS in hourly, Operator positions for a period of time in Victoria, Texas. None of these individuals ever complained to me that they were not paid for work they performed "off the clock" or that their overtime pay was calculated incorrectly. I am also not aware that these individuals ever complained to anyone else at IPS that they were not paid for "off the clock" work or that their overtime pay was calculated incorrectly. In my position as District Manager, I would have been informed of and/or known about such complaints.

12. Based upon a review of personnel forms, Mr. Hooker was employed as a Pump Operator from July 9, 2012 to January 4, 2016 and worked in Victoria, Texas. For a short time in 2015, Mr. Hooker also worked in a light duty position in the administrative support office following an on-the-job injury. He would not have received a daily job bonus in such role. Mr. Muniz was employed as a Senior

Coil Tubing Operator from August 1, 2011 to June 5, 2015 and worked in Victoria, Texas. Mr. Radcliffe was employed as a Senior Pump Operator from February 20, 2012 to March 3, 2016 and worked in Victoria, Texas.

13. Additionally, although I did not supervise Plaintiff Craig Nelson, a review of Mr. Nelson's personnel file indicates that he was employed as a Pump Operator from March 5, 2012 to December 16, 2013 in Victoria, Texas.

Further, Affiant sayeth not.

EXECUTED on February 15th, 2017.

_____
SCOTT MCFARLAIN

SWORN TO and SUBSCRIBED before me, the undersigned authority, on the 15th day of February, 2017.

_____
Notary Public in and for the State of Texas

IDA HEYSQUIERDO
Notary Public, State of Texas
Comm. Expires 02-15-2020
Notary ID 128885241